for your panel this morning. In this case, this first case, which is Christopher Ron Holm versus Meshia Rachel Lake-Harm. Ms. Fisher, you represent Christopher Ron Holm and you will have 17 minutes to present your case. Thank you, Judge Ennis. Good morning, your honors, and may it please the court. The district court's denial of Mr. Harm's Hague petition should be reversed for three reasons. First, despite the U.S. Supreme Court's clear precedent that an assessment of a child's place of habitual residence requires a court to consider the totality of the circumstances a particular case presents. In this case, the district court based its conclusion on a single factor. Second, the district court's conclusion that Mr. Harm somehow consented tacitly or otherwise to SLH's abduction is an absurd conclusion that is wholly unsupported by the record. Finally, the district court committed reversible error in concluding that SLH would be subjected to a grave risk of harm if returned to Ireland. This court should correct those factual and legal errors on appeal, reverse the district court, and render judgment in favor of Mr. Harm. As an initial matter, your honors, I want to be clear about what is and is not before this court. The issue before this court is at base a jurisdictional one. This is not a custody case. Should this court reverse the district court and order SLH to be returned to Ireland, the judgment would have no impact on the party's ultimate custody dispute and would instead simply allow an Irish court to exercise personal jurisdiction over the minor child. To be clear, reversing the district court would not award Mr. Harm any custody rights over SLH, nor would it remove any custody rights from Miss Lake Harm. And as this court has recognized, courts evaluating a Hague petition are statutorily precluded from doing so. In fact, reversing the district court would not require that SLH be permanently relocated to Ireland. And as this court's precedent shows, the sole impact reversing the district court's order would have is to require that SLH be returned to Ireland until such time as a custody determination can be made, which is exactly how the Hague is intended to function. Now, Judge Dennis, your 2017 opinion in Madrigal we tell us is particularly instructive on this point. That's 848F3669. In Madrigal, the court explained that the return remedy was designed simply to ensure that the courts of the state of habitual residence have jurisdiction over the child in order to make a lawful custody determination. And as this court in England versus England explained, the convention works to quote, restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court. But that's exactly what Miss Lake Harm did in this case. Miss Lake Harm's plan to avoid a less favorable Irish legal system and clear intention of obtaining sole custody of SLH is precisely the type of conduct the Hague Convention seeks to address. It's cliche. Did I mispronounce your name? Probably I did. Sorry, we're in Louisiana. So the difficulty that you face is the standard of review. I understand you make a game argument that it should be de novo, but let's assume, at least for my purposes, that it's clear error. So that's a steep hill to climb. I read the district court's oral ruling. Not all of it's clear, but the district court does seem to make a factual finding that the child's residence in Ireland was transitory and not habitual. So how do you overcome that on clear error review? Yes, you are. So I would just first point to the U.S. Supreme Court's holding in Manaske. Manaske said you need to look to the totality of the circumstances presented. And certainly, as Your Honor recognizes here, arguing that the place of habitual residence could not be Ireland simply because it was too transitory focuses on a single factor. It also credits a factor that really doesn't show that it was too transitory to become a place of habitual residence, precisely because the type of travel that Ms. Leigh-Karm engaged in, which she testified she had engaged in since 2007 and began doing with SLH as young as three months old, the type of travel she was engaging in while she was living in New Orleans was simply a continuation of that travel in Ireland. Ms. Leigh-Karm testified that each and every time she and the minor child traveled for work, they were turned habitually to Ireland. So I would say, Your Honor, that firstly, it's clear error to not consider the totality of the circumstances presented in this case. And so that just based on a single factor alone, I believe is clear error. And then when you actually look at that factor that the court based it on, I don't think that's enough in order to overcome the fact that when they moved to Ireland, they established SLH's life in Ireland and took all the steps necessary to make her an Irish being born. Yes, sir. Ireland for then how long after that? Yeah, no. How long was she in Ireland? So they had a two month difference between when they left New Orleans and before they entered Ireland, they were touring Europe with Ms. Leigh-Karm for her formances. They entered Ireland and they were in Ireland for 10 months before her abduction in May, May 21st, 2019. Okay, so 10 months. So is just the actual temporal length of time that a child spends in a particular place? Is that a relevant factor to consider? Under Minaski, yes, Your Honor, it is. I would, however, point to you the several cases in which young children, children as young as SLH are when they were abducted or relocated. SLH was several other cases show when a child is young as one year old, 10 months is a significant amount of time. And so when a clear abandonment of a prior residence is made and families move together to a new country, the new place of habitual residence attaches fairly quickly, particularly in the cases of a one year old child, Your Honor. Is another factor. No, no, go on. I'm good. What I was going to ask is, can you tell me any distinction at all between the actual number of months and the one that the, I think it was 41 that the district court came with. That's less than two years old and less, a little over three years. I apologize, Your Honor. I understand your question to be that Miss SLH was two when she was abducted. I'm sorry. I'm not sure I understand your question. I'm wondering what difference in law or in fact, it would matter on a child that young, whether the actual age or the mistaken 41. Oh, I understand, Your Honor. Sure. So before the district court, the district court stated that for her entire 40 years, 40 months of life, the majority had been in the United States. However, that incorporates a significant portion of post removal conduct cannot be considered in determining whether at the time of her abduction, she was habitual resident of Ireland. And so the district court, I believe clearly aired in assessing post removal conduct in a case that does not present a well settled defense. And so having considered that post removal conduct, I think is an additional error that this court should consider on appeal. And so that's the Yeah, but with the totality of the circumstances and clear error review, how could this one temporal error control the outcome of the case? So I would say, Your Honor, that it's not just one error that the district court committed. It's a that makes it clear that the outcome was incorrect. For example, the US Supreme Court in Manaski listed several factors the court must consider when assessing a child's place of original residence. Among those is whether there was a clear change in geography, whether the family brought with them their personal possessions, whether they brought their pets with them, the passage of time, whether the family abandoned their prior residence, whether they applied for and secured benefits available only to and importantly for SLH, who was only one year old when she was relocated to Ireland, what the parents joint intention for the move was. And when we look at those factors, the Manaski factors, each and every one is met in this case. But the district court didn't mention a single one. And as Judge Duncan pointed out, the district court based its holding on the fact that the travel of the frequent travel that Ms. Lake-Harm engaged in. And as mentioned previously, that was just a continuation of her prior travel. I think there's a clear abandonment of New Orleans as a place of original residence. And as prior courts have held, when it comes to a child who's only one, that child reestablishes a place of original residence fairly quickly. And particularly in light of Ms. Lake-Harm's declaring that she and SLH were ordinary residents of Ireland, her public, private, and in fact, testimony in the court below that when they moved to Ireland, they intended to acquire citizenship for SLH and her testimony at ROA 630, that she understood that it would take at least five years to obtain citizenship shows that they had every intention of being in Ireland for a significant period of time. And so just saying that there's one error, I believe there are several, particularly- ruling. He seemed to rely a great deal on the marital instability that was longstanding, I guess. I don't know when it started. It seemed to have started before they left for Ireland. How does marital instability factor into the habitual residence determination? He seemed to be concerned about that. I agree. I believe he was concerned with that, but I don't know that it has a significant impact on SLH's place of habitual residence. As you mentioned, there was marital instability before they even went to Ireland. They decided that their marriage was untenable before they stepped foot in Ireland, and yet they moved in together to raise their child. And from SLH's perspective, Your Honor, which is who this court's analysis must center on, SLH moved with her mom, dad, and dog to Ireland, where she had a bedroom with all of her toys, all of her furniture, and all of her clothes. That's where her dad and mom were. And although she traveled with her mom like she did when she was living in New Orleans, she always came back to Ireland. But as I read the other side's brief, and I'll ask them about this, the other side characterizes this as sort of setting up a base in Ireland for European touring, basically, such that it is a residence, but it's sort of a transitory residence that's there simply to facilitate Ms. Lake-Harm's music touring. I mean, if there's evidence of that, don't I have to prefer that view to your view? So the district court, I believe, credited Ms. Lake-Harm's... Well, to be clear, in her brief, she said that she was establishing a place of residency just for the summer of 2018 gigs in Europe. However, she testified that they were moving to Ireland in order to establish SLH as an Irish citizen. And in addition to that, it just doesn't... It's an untenable finding, given that SLH moved to Ireland in May of 2018 and was abducted in May of 2019. Certainly, that's not just one summer of gigs. That's an extended period of time. And so to say that home base of operations was an only temporary situation, which Ms. Lake-Harm never testified to, nor is there any evidence that she intended this to be a temporary situation. In fact, she's testified to the contrary in her public, private, and testimony statements. The district court also seemed to rely heavily on the idea of consent. I'm not 100% sure of how exactly it factors into it. Obviously, if Mr. I would think if Mr. Harm consented to her leaving Ireland with the child, then that's significantly hurts your case. So what do you say to that? Do we also have to find that the district court clearly erred on finding consent to take the child out of Ireland? So, Your Honor, under the Hague Convention, there's three factors that the court first considers as an initial matter. Two are undisputed. The next would be that the child's place of original residence was Ireland at the time. So we think we win on that. Now, then the court would have to proceed to the exceptions to the convention, which Ms. Lake-Harm advocated in the court below and the court was persuaded by. One of them is the consent defense. And we think that that's an absurd conclusion that the court reached, just given that Mr. Harm objected the same day he learned that his child was not being taken to Tucson, but was in fact being relocated to New Orleans. And I would direct the court's ruling in Larby v. Larby, where the court explained that when examining the consent defense, a court must consider, quote, what the petitioner actually contemplated and agreed to in allowing the child to travel outside its home country. The nature and the scope of the petitioner's consent and any conditions or limitations should be taken into account. And in this case, we know that Ms. Lake-Harm, after she had moved out of the Woodview house, she took out a second year-long lease in New Orleans and then decided to start telling Mr. Harm that her mother was gravely ill. She told him that her situation was, quote, dire. And so understanding that the potential for his mother-in-law to be very ill, he readily consented for SLH to travel to Tucson, which is where Ms. Lake-Harm led him to believe she would be going. In reality, she had relocated her and SLH back to New Orleans. I would say that the deliberately deft nature of her conduct is demonstrative of his lack of consent. Ms. Lake-Harm did not travel to Tucson to see her allegedly desperately ill mother until nearly six months after arriving in New Orleans. She also said that she had to go to New Orleans for financial reasons, but that's also internally inconsistent with her prior testimony, which was that because of how urgent her seeing her desperately ill mother was, she forgoed several European gigs. It doesn't make sense that she would be going for monetary reasons. She also shipped nearly 4,000 euros worth of items back to New Orleans two weeks prior to going to New Orleans, which Mr. Mr. Harm didn't discover until after his daughter had already been abducted. I just don't see how that this court's precedence would not allow for consent defense to be substantiated based on those facts. So I would just also like to point out that the grave risk of harm defense is also not a viable defense in this case, and I would just point out that conspicuously absent from Ms. Lake-Harm's brief in the court below and indeed on appeal is a citation to a single case analogizing the facts of this case with the facts of a case in which a grave risk of harm was actually found. And I think that's significant, especially when you look to the types of facts that this court has found do show a grave risk of harm. Comparing them to what we have here, we just don't have a grave risk of harm. And so I would say, Your Honors, looking to the case law, particularly the case law that shows the case of a one-year-old child who's abducted at the age of We would just ask that you reverse the district court and render judgment in favor of Mr. Harm. Thank you. Finished? Okay, we'll hear from you, Ms. Lasky. Good morning, Your Honors. Katherine Lasky on behalf of the respondent, Ms. Shea Lake. First, Judge Duncan, as you pointed out, it is clear from Minaski and from this court's decision in Smith v. Smith that this is a clear-of-error standard of review looking at the totality of the circumstances of the district court's decision. That was raised by Judge Elrod in the Smith v. Smith oral argument and clearly decided by her. This is a fact-intensive analysis. Well, I tend to agree with you, Ms. Lasky. It's the facts that then caused me some problems. I if there's agreement on some of the facts, there's a lot of disagreement. Is there agreement that Mr. Harm and Ms. Lake Harm moved to Ireland? They moved to Ireland to be in Ireland, right? They didn't go there for tourism. They moved there. There is agreement that they moved to Ireland, correct. There is agreement on that, yes. Go ahead. I'm glad you agree on that because I've looked at the evidence and I've even seen the video where she gives an interview and she says very forthrightly, I'm leaving the United States. I don't want to live in the United States anymore. I don't want to live in New Orleans anymore, although she obviously has a lot of affection for New Orleans, but she explains why she doesn't want to live in the United States or New Orleans anymore. I think it is a given that they moved to New Orleans. It is a factor, but as this court in Smith v. Smith recognized, that is the shared intent of the parties, and that cannot be the dispositive factor. It's in footnote one of Smith v. Smith, in light of the Supreme Court's holding in Monaskey, that a child's habitual residence should be determined by looking to the totality of the case. If the other case has prioritized the parent's shared intent over other factors, we overrule that emphasis. Well, so you agree that it's a factor. Let me see if I can get agreement on another point. In May of 2019, I think is a relevant date. I don't remember the day, but May of 2019, your client took the child from Ireland to New Orleans under false pretenses. Do you agree with that? I do not agree with that, Your Honor. Okay, what is the evidence that shows anything that counters what I just said? She told Mr. Harm, and let me just pull up the record. She told Mr. Harm that she was going to the United States because her mother was ill, and that she had an open-ended ticket. She told him that. Her mother in Arizona? Excuse me? I'm sorry. Her mother in Arizona? Arizona. I do not know. Her mother was in Tucson, Arizona. Did she go visit her mother in Tucson, Arizona on that trip? She did. She first went to New Orleans because her mother, as she testified, her mother said, please don't come right now. I'm not able to have you come, and so she went to New Orleans, which is where she'd been just two weeks prior performing for the jazz festival and other gigs, and waited in New Orleans until her mother told her it was okay to come. Which was how long after that? I don't believe it was six months, Your Honor, but it was, I recall it being a month or two. Does the record show that she shipped a bunch of belongings secretly back to New Orleans from Ireland without telling Mr. Harm? The record reflects that she shipped some belongings back. I don't know whether she secretly hid that from Mr. Harm. They were living separate and apart from that at that point, so she didn't. Did she take the dog? Excuse me? Did she take the dog? I believe she took the dog, who was her dog prior, and had been living with her when they were together. I think there are a lot of other factors that the district court properly considered that go to the totality of the circumstances case that my opponent has not mentioned. First, the citizenship of all the parties. The mother and the child are U.S. citizens. The father is not an Irish citizen. He's a citizen of the U.K. and Northern Ireland. The child spent her first 18 months in the United States. That's what the district court found, two months traveling in Europe. Then for the 10 months that they were in Ireland, she was out of Ireland and other parts of Europe, in Asia, and then three trips to the United States, putting aside the last trip in May. Every time she did that traveling, where did she go back? Every time she ultimately went back to Ireland. I mean, come on. They moved to Ireland. She ultimately returned to Ireland. Correct. Yes. Because they had moved there. They had moved there for a period of time. Yes. But again, Your Honor, I think that that is not enough to establish habitual residence. Who was the child's habitual residence then? Well, I think that the child's habitual residence during these 10 months, she may not have had one, and that's okay under the convention. There is case law that if a child doesn't have a habitual residence, then the petition still must be dismissed. But I think the answer is Mr. Harm has not sustained his burden that Ireland was the child's habitual residence. There were no family connections there. There was one family member, his brother, who came to visit once. She attended a toddler group two or three times. There were no social connections for the family. They both wanted to have EU residency for the child so that the child could have access to social services in the EU? And potentially go to university there if she wanted to. Yes. That was the testimony. Establishing residency in Ireland? I don't know if that's the whole premise of that. You have to be a resident of some member of the European Union in order to have access to EU benefits. Yes. I believe the parents have to be as well. Correct. And the child too. They wanted benefits for the child. Yes. Yes. That was the idea when they first went over there. Correct. Let me ask this. Habitual residence is a term that's used only in this agreement. We usually talk about residency and domicile and the two are different. Is habitual residency the equivalent of domicile or is it equivalent of residence? Well, Your Honor, Judge Maynard, I think that's a very good point. And I will say if you read Justice Alito's concurrence in Monaskey, he recognizes that he talks about definition of home and how home is multifaceted. So it can be generally where you sleep, eat or work, but it's also where you have an emotional connection. And I think habitual residence is broader than either domicile or residency because you do look at the social, emotional factors that contribute to where somebody calls home. But in this case, I think even looking at the objective factors of residency, Ms. Lake filed taxes in the United States the entire both in 2018 and 2019. She kept bank accounts in the United States. She kept personal prized possessions. And there is testimony. Judge Duncan, I agree they did intend to go over there, but there was testimony at the hearing by Ms. Lake and also by Ms. Davis that this wasn't intended to be a forever move. And I think if you look at this court's decision in Smith v. Smith. How long would it take to get a new residence? Do you know how long it would take them to get a new residency? I believe it was a year so that they could get residency and she could come and go, continue to come and go for touring. So I believe it was a year. So, Judge Wiener, to go back to your question, I think it is habitual residence is a broader question than just residency. Whereby it takes into your social ties to the place that is being asserted as the habitual residence as well as sort of the objective factors. Domicile is determined on the intent of the person. And what is there, if anything in this record, that would counter the district court's finding and support domicile from an intent standpoint? So, you know, I think the district court recognizes that intent is relevant, but not the sole factor. I mean, that's what Menaski changed, right? I mean, that really was the difference other than holding that there didn't need to be an actual agreement, but also that shared intent was one thing that they looked at. So I think the district court considered the intent. And just to answer the question about marital instability, I think that the difficulty of shared intent when there's such marital instability is, you know, how do you share an intent when you're not really a viable marriage, right? And you're not really sharing anything. And so I think that the marital instability, while I agree, it existed prior, there was a brief reconciliation when they were traveling in Europe prior to arriving in Ireland. They did enter Ireland together, but at that point, their relationship was really, you know, had fallen apart. Well, when they finally decided to move out of the Woodview house, where did she move? She moved to Wexford, which was several, she did move to Ireland. Yes, she did move to Ireland when she didn't want to live with him anymore. She moved to Ireland. Yes, she did for a brief period of time. Yes. So again, so I think we look to the citizenship. Nobody in this case is Irish. We look at the amount of time that she was in Ireland and not in Ireland. We look at her community ties. For example, the record was clear. She had two birthday parties in the United States when she turned two and nothing in Ireland. When the district court says that, is it considering post removal conduct in determining a residence? It is not. How could the district court not be considering post removal conduct when it's considering her birthday after she returned to the United States? It says she had some friends at the birthday in the United States. I'm sorry, your honor. Go ahead. I apologize. I'm just trying to get at whether the district court is considering post removal conduct, which would be clearly wrong. Those birthday parties were on one of the three trips that the mother and child took to the United States during this 10 month period. So I want that to be clear. She turned two prior to May 2019, when they finally left Ireland. And during one of those trips, it was over the Christmas holidays, they were in the United States. And that's when those birthday parties occurred. They were on a trip with Mr. Harm's consent. There is no dispute that all of the travel prior to May was with Mr. Harm's consent. I think everybody agrees about that. So that's when those birthday parties occurred. They did not occur post removal. So I think I just want to make sure that we are clear on that. The only post removal conduct that the judge mentions in that the district court mentions is the fact that the child attends attended school in New Orleans after the removal. Other than that, everything that that is in the judges, the district court's opinion is pre removal conduct. Say about the child attending school in New Orleans after removal. How is that relevant? I don't it's other than it's kind of in recitation of facts. I don't see it as relevant to the court's determination at all. I mean, the court looked at the fact that there was the playgroup that happened two or three times. You know that she only attended a playgroup two or three times in Ireland. That's again, another undisputed fact. But this was a recitation of the fact there's there's no, there's nothing in the judges conclusion or in the ruling after the recitation of facts about attending about the post removal conduct of attending school. The other thing is, unlike Smith and Minaski, there's no Irish court order here granting petitioner any custody rights. You know, in Smith, there was an Argentinian custody order. And in Minaski, there was a court order from an Italian court. In fact, Ms. Harm testified and this was again, undisputed because Mr. Harm testified that sorry, Ms. Lake testified in this is undisputed because Mr. Harm said that he delegated anything related to the separation and divorce to her that when she went to ask if she could get a divorce in Ireland, they said no, because you aren't the lawyer that she spoke with said that they weren't eligible for a divorce in Ireland. Um, so I also just again want to I think the record the other undisputed facts are that Ms. Harm had no steady work in Ireland and no ability to provide for the child. She maintained possessions, bank accounts and work opportunities in New Orleans. Mr. Harm provided no financial support for the child after Ms. Harm and sorry, Ms. Lake and the child left Wexford House and moved to there and has not since. And, and that, you know, as Mr. Harm said in a contemporaneous email, he had been in Ireland for an entire year. And he had rarely, you know, seen his daughter, again, because he saw great value in having her see the world. Yes, we cannot change the fact that this was that there was a lot of travel during these 10 months. And so because of that travel is not the only factor that the district court concluded or considered. It was everything else that led to the fact that there was no habitual residence for this child. And again, this is Mr. harm's burden by preponderance of the evidence that there was no habitual residence in in Ireland. And just to briefly address the consent and the grave risk of harm. The only way that your honors need to consider those defenses are if you decide under a clear error standard overview of the totality of the circumstances that Mr. Harm has sustained his burden to show that Ireland was habitual residents because that's the threshold question. And then counsel is correct, then you get to the defenses. And with regard to grave risk of harm, we submit that the judge heard evidence from multiple witnesses about physical altercations between Mr. Harm and Ms. Lake, and, and her testimony about, you know, inappropriate behavior by Mr. Harm that would put the child at grave risk of harm. And I think, as well, you know, it is also prior to the removal with Ms. Lake as her primary caregiver. If the court, oh, and finally, I would just like to say that in Manaski, Justice Ginsburg said that the petitioner in that case, or the United States that was in a amicus said that they had not identified any additional fact that district court did not digest. And your honor, I would submit the same, your honors, I would submit the same thing as is here. There is no factor that the district court did not conclude. What petitioner is urging is that, well, no, he heard all this evidence, the district court holds all the evidence, but he made the wrong determination. And on clear error, they just have not sustained their burden to show that this was clear error, given all of the facts that were presented, all of the facts that were issued by, or lifted by the district court in its ruling, the fact that it said repeatedly, totality of the circumstances, credible evidence, and we submit that the district courts, yes. One final question. Absolutely. At pages 21 and 22 of Mr. Harm's brief, he's discussing when Miss Harm is Miss Lake is talking to Mr. Harm about attorneys advice that she has sought with respect evidently to a divorce in the brief recounts of this fact from page 9 67 of the record. Miss Lake harm stated to Mr. Harm that the attorney quote suggested making a separate document for custody so they could submit it to the Irish government as well as Ireland has been SLH is habitual residents for the last nine months. Is that first of all, is that accurate? Is that in the record? Did she actually tell Mr Harm and discussing the attorney's advice that Ireland has been SLH is habitual residents for the last nine months that that is in the record. And that was re repeating what an attorney and I don't know who that attorney was, um, had told, um, Ms. Ms. Lake. Okay. Thanks. Sure. Yes. Sure. You have, uh, thank you. Uh, I just like to first point out that just providing lip service to what the standard of review is and then not applying it is not applying the standard that you just said you had articulated. Um, for example, the district court did not make a single finding as to shared intent. Uh, we talked about shared intent and the shared intent of the, of the petitioner and the respondent, regardless of their marital troubles was to co-parent SLH in Ireland and to seek citizenship for her. And again, that's always six 30 that, um, Ms. Lake harm testified that she was seeking citizenship for SLH. Um, and she, again, at six 30 reaffirms that she understood that that would take a period of five years, not one year, five years. Additionally, they had already achieved residency. That's our way 10 54, but that was also not the aim of moving to Ireland. Even after the marriage dissolved, uh, Ms. Lake harm was at that point, just Ms. Lake. She decided to change her last name to add harm to it and stay legally married to Mr. Harm in order to ensure that she and SLH would maintain their eligibility for Irish citizenship. On top of it, we've talked about Smith versus Smith and the courts, this court's consideration of citizenship in that case. And in that case, the court considered the fact that these people were not, um, citizens of, I believe it was Argentina in the context of, because they were given the opportunity to come to become Argentinians, Argentinian citizens, and chose not to. That is the context in which you should consider the fact that they were not citizens of Ireland. Otherwise, I don't believe it's relevant to determine whether they chose to reestablish their habitual residence in Ireland. Um, on top of that, I would just like to also point out, um, just to clarify your honors question about at what point did like harm go to see her parents after going to new Orleans instead of Tucson, um, Ms. Lake harm abducted SLH on May 21st, 2019, and did not go see her parents until October 25th, 2019. Um, in between that time, Ms. Lake harm who had always traveled with SLH actually returned to Europe, conspicuously not bringing SLH with her. I think that's a relevant point in terms of Mr. Harms consent or lack thereof, we would submit on top of that. Um, when she did go to see her parents on October 25th, she told Mr Harmon. This is also in the record that she was actually just dropping off SLH before she went back again to Europe. That was a slap in the face to Mr Harm. Uh, and, um, uh, on addition to that, um, primary care Mr Harm. Are there custody proceedings going on in Ireland? Or has that ever happened? Or they're currently I see a few seconds left. They're currently proceedings that have been, I believe, stayed for jurisdictional reasons in CDC. Mr Harm is awaiting this court's determination before filing any type of proceedings in Ireland. Thank you. Thank you. I've lost my picture on my screen. I'm trying to get somebody to fix it for me. Can you hear me? I can hear you and see you. Hear you and see you. I'm just, I mean, I'm trying to get my offer.